Good morning, members of the panel. Thank you for hearing this matter. Ms. Panagacos actually is present in the courtroom and there are a lot of people associated with this case and supporters of this case who are here. I want to point out to start, my name is Lawrence Hildes. I'm counsel for plaintiff's appellants. I want to point out to start that these are particularly significant times for this time we were up, the military has now been used increasingly to break up and end demonstrations. Standing Rock is the example that comes to mind. But Ferguson and a number of other incidents have happened since this case was decided, and it causes us great concern to have a military that is not trained to do so, doing civilian law enforcement. In addition, the domestic spying level was going up and has gone up a great deal more since January, and we're fighting off in a number of places subpoenas for listservs of activist groups and seeing activist groups in places like Portland labeled as domestic terrorists. In fact, they labeled the Oregon Department of Justice civil rights director as a terrorist for supporting Black Lives Matter. So this case is even more relevant, and we think that this is an appropriate time for this court to weigh in and protect the First Amendment. A standard here, as with the first case today, is summary judgment. And we believe the court did not handle the standard correctly. They did not follow cell attacks. They did not follow the other standard cases and instead weighed the evidence, determined credibility, and did so very selectively. Okay, you can probably help me out best by starting out with the episode in which you think the First Amendment claim is the strongest. Could you describe that episode? I will try to. I will pull one out. I will point out that the totality of the circumstances was the biggest part of the chill. But the fact that people were being arrested on the way to demonstrations, after lawful demonstrations, and while acting at demonstrations doing nothing illegal because they had a potential to maybe commit illegal acts in the future, the attempted disorderly conduct, is one of the primary. And the fact that they could not stand on the street corner in Tacoma and not be arrested for trying to demonstrate. The fact that there was no First Amendment right allowed and that it was systematically denied. But I've got such a list of... Well, but I'd like you to give me the one that's the strongest. That doesn't mean to say you're giving away the others is not valid. But I'd like the strongest one and not just a general, well, reference to demonstration and so on. Is there a specific episode where you think the First Amendment claim is strongest? The labeling of our clients as domestic terrorists and then repeatedly arresting them without pretext. Which goes back to exactly what the church committee talked about, goes back to Mississippi and Alabama. This idea that because they are demonstrating, they are guilty. Because they are guilty, they are terrorists. So you talked about arresting without cause. Which arrest are you talking about? I mean, I just want a specific example. I'm trying to give you one example. There's so many. Brendan Dunn was arrested seven times in two and a half years. The Phil Chin episode, which was a different lawsuit, but was based on this conduct where he was arrested for DUI at 10 o'clock in the morning having not been drinking because his car was on an attempt to locate list from the license plates that Towery and Rudd and Tacoma put out. And he was charged with DUI when totally sober. The fact that I'm trying to pull out another very specific one. The women who were arrested for attempted disorderly conduct and then subjected to pepper spray and rubber bullets is another one. The Tacoma situation where they let loose with less lethals and did so in front of a crowd that was fleeing so they couldn't go anywhere to prevent them from coming back. There were repeated uses of force that were designed to prevent them from coming back. And the fact that they were getting arrested wherever they went in the country because these dossiers were kept on them. It's an entire pattern. I'm struggling to pull out one particular example because the totality adds up to a situation where nobody could exercise their rights anymore. And it was the way the Constitution is usually lessened and eliminated. It's chip, chip, chip at different portions of the First Amendment, at different exercises until there isn't anything. And there is the fact that this was used as a military operation. There were threat assessments on these people as if they were an opposing military force. And that act and that pattern and then labeling them as terrorists and treating them accordingly has an overall effect and it manifests itself in this whole series of arrests. You're presenting them as if they are totally innocent and harmless victims of all this oppressive behavior. Certainly, there were certain things that happened that arguably might have animated the security people to take action. Some of them at occasional points, and this is a campaign that went on for four years, committed peaceful acts of civil disobedience where they blocked a military convoy or they locked themselves to a fence. These are acts that are easily dealt with. Somebody commits an act of civil disobedience by getting in the road, you get them out of the road. You arrest them. It doesn't require a major intelligence operation and it doesn't require labeling them as terrorists. What happened is once the military took control of this, they lost all perspective. They became the enemy. So you're telling me that the labeling of these folks as terrorists is what really triggers your First Amendment argument? And then the actions to arrest them, to prevent them from demonstrating, to make it a military objective, to prevent them from peaceful protest. Tell me a little bit more about the labeling of these folks as terrorists. How was that manifested? Towery brought information to the regional intelligence group, which was Tacoma and Pierce County, Adamson, Smith, Court John, and Adamson then sent them out and said, I want you to come up with a domestic terrorism profile for these people to be distributed by the state patrol at domestic terrorism conferences. So they took Brendan Dunn, Jeff Berryhill, two other folks, listed things that they'd been arrested for and acquitted or dismissed on and said, they are violent people. They are a threat to the government. And then listed their domestic partners, their homes, and any other information, where they've demonstrated, where they might go. And these were put into a binder and handed out all over the region, handed to the FBI, handed to the military, with domestic terrorists written all over them. Are you saying that all of these demonstrations were so-called peaceful demonstrations? Yes. Even Towery and Rudd in deposition admitted there was never an act of violence. The closest Towery could come is to say that he saw a posting on a website by somebody else that he says showed a picture of concrete poured on railroad tracks somewhere that he said was supposedly Olympia. He never actually produced the pictures. He never actually saw it. But that was the closest he could come. And there were no acts of violence. These folks took a strict nonviolent pledge, which was they could not participate unless they signed it and carried it out. And they were very, very serious about that. These were actions that were peaceful and that were... And if the military, the military should not be dealing with this. It's a civilian law enforcement situation. But there's no reason a civilian law enforcement agency can't show up when people are blocking a road. There's a minor delay. They get them out of the road without destroying the Constitution. You don't launch a major... Could I interject a question, please? What bothers me a bit is that if the military is coming in when someone's blocking a road, but they're blocking a road to a port where military goods were going to be shipped, doesn't the military have some legitimate interest in being involved in that? They don't have a law enforcement interest. They can ask civilian law enforcement to deal with it, which civilian law enforcement is training, first of all. Second of all, that doesn't justify sending a spy in because they might get blocked. I mean, they get blocked all over the world. And it doesn't justify sending somebody to unrelated meetings about protests at political conventions 1,500 miles away. It doesn't justify going to birthday parties. And it certainly doesn't justify trying to persuade them, these people who are supposedly a threat, to buy and learn how to use automatic weapons, which Towery did. Towery took Glenn Crespo and other members of the Pitch Pipe household to a gun show, tried to persuade them to buy assault rifles, and pushed them to let him teach them how to clear a building. They wanted no part of this. They had taken a nonviolence pledge. They didn't want anything to do with this. They were worried about his sanity. They thought he was too stressed out. There is no legitimate government purpose or military purpose in doing that. The only thing you can use that for is entrapment. And they didn't take the bait. Thank you, counsel. So there's a number of... I wanted to go to the issue of the military versus civilian. Judge Layton's argument was that the Fourth Amendment allows this, which we dispute, and that the First Amendment allows this under Mayer, which we dispute. He said, therefore, the military is allowed. But, in fact, the posse comitatus acts as the military cannot do civilian law enforcement. So he's wrong on that point, and for very good reason. They are trained to find the enemy and neutralize or eliminate them. The role of public law enforcement is to protect the public. I'm a little unclear whether you're claiming that there's a civil right of action under the Posey Act, under Court Vieche. I'm sorry, I didn't hear that. Is there a civil cause of action that you have under the Posey Act? No, it's there for illustrative purposes. But it raises the Fourth Amendment burden. You're relying on the Fourth Amendment. You're not saying that you're relying on the fact that you have a civil cause of action for a violation, allegedly, of the Act. Correct. But it illustrates that the conduct is illegal, and, therefore, it cannot be permissible under the Fourth Amendment. The argument is essentially the same argument that convinced Judge Arnold in the Wounded Act that contributes to a decision that is unreasonable. Exactly. And I want to talk, too, about the Mayer case, the invited informant, because they can... I mean, an argument has been made that Towery was invited. But Mayer also... He was disinvited on several occasions. He was. He was disinvited. And, in addition, it has to be for a legitimate purpose. I do want to reserve two minutes, by the way. I'm kind of watching. A legitimate law enforcement purpose, you could argue conceivably, if they were allowed to do it, was finding out when they were going to do a blockade. But, in fact, that's not necessary. And there's no legitimate purpose in getting on an attorney-client listserv that says attorney-client listserv and only talks about defense strategy. There's no legitimate law enforcement purpose in training them to use guns. There's no legitimate purpose into going to unrelated meetings. So he's not an invited informant at that point. He's way beyond the scope of the theoretical purpose. And, in addition, at scale, Mayer is a case where you're talking about potential rape of children. This is a case where you're talking about people standing in a roadway and potentially blocking a vehicle. It doesn't... The scale of it... So this is in the summary judgment posture, correct? And I guess your procedural argument is that this is not the proper vehicle, given the Exactly. And now you have to then deal with qualified immunity on top of that. So it seems like, well, there's a legitimate interest, I guess, or could be argued, you said the spy in, for lack of a better word, to alert the authorities that there may be some protests or some blockage of military equipment. Is this not a qualified immunity dynamic? No. The Army... First of all, the Army is on notice, going back at least to the Church Committee, that it cannot, and the Wounded Knee decision, the Redfeather decision, that they cannot engage in this conduct. They are on constitutional notice. And, again, we are dealing with nonviolent civil disobedience, which is easily remedied by law enforcement. There's no victim. There's no long-term harm. It's momentary inconvenience, which does not justify a major operation. Correct. But is it not commingled with the aspect of the military interests that are involved here in trying to prevent the blockade of military equipment? I mean, is this so clearly established that qualified immunity does not attach? There is no case that allows the military to spy on domestic political organizing. There is a great deal that says no. And, in fact, the Church Committee findings came out of the military trying to prevent, among other things, actions at the Oakland Military Induction Center in California, which would have been an analogous military operation. And they were trying to prevent draftees from leaving the building and being deployed to Vietnam. So I don't think... I think they are on notice. In addition, there is a lot of case law on First Amendment chill. And they didn't simply try to put civilian law enforcement on notice that demonstrations were coming. We had the colonel who was towery supervisor on one chain of command and two levels above him on the other saying, we frustrated them at fulfilling their objections by working seamlessly with civilian law enforcement. So I'm not so sure I understand. So you're saying that the failure to give civilian authorities notice of these events is what saves you from the qualified immunity dynamic? I think there's a great deal of case law that says that you cannot arrest people without probable cause. That's not a new one. That you cannot harass people because their political views. Mendocino has been on the books for a long time, for example. And this was an intent to completely... They succeeded. The group no longer exists. Five of the seven people moved away. None of them do political work the same way they did before. I'm not talking about... Yes, I'm confused. ...civil disobedience. What confused me, you seem to be saying to me, tell me if I'm wrong, that they had an authority because they did not do that. The law is clearly established that they're not entitled to qualified immunity. I don't think they were... I don't think the military was under any obligation to give notice. The military can say, we're concerned there might be demonstrations, and that's it. They don't get the right to send an informant in to join the group and go to unrelated meetings and unrelated events just so he can occasionally report that someone is considering civil disobedience, first of all. And second of all, civil disobedience didn't even come out of those meetings. It's an individual act of conscience. It came out of small meetings that were independent of all of this. It's like saying that it would have been okay to send the army into SCLC, undercover, because people might march across the Edmund Pettus Bridge. There is... The harm that it causes so drastically outweighs any utility. And they are unnoticed. They are supposed to balance the First Amendment against the law enforcement, the usefulness to law enforcement. And there are ways to do... Is the balancing requirement really cut against the argument that qualified immunity does not apply? No, because there's lots of notice that you overstep the bounds. And furthermore, there's case law that says, from this circuit, that says you cannot come up with a novel way of violating people's rights and then say, well, it's not clearly established. There is so much case law protecting the right to demonstrate free from law enforcement harassment. There is so much case law that says that you cannot preemptively prevent or sabotage people's right to demonstrate, Collins v. Jordan, because you think that they... Because a previous event, someone committed something illegal, which is what we're talking about. They did civil disobedience on four sets of occasions for short periods over four years. They were also prevented from legal demonstrations. What Colonel Beard was talking about was a peaceful picket at the Tacoma Mall. Not a military objective, not a military site, but one that Tacoma was concerned about. And I'd like to reserve, if I can. Well, we've taken you over time, or perhaps you've done it all by yourself. But as you've probably seen from my prior practice this morning, we will make sure you have a chance to respond. Thank you, Your Honor. So I gather we've got three people arguing. Give me a hint as to how you want to divide up your time. Good morning, Your Honors. My name is Tom Brennan. I represent Appellate Defendant John Towery. Our plan is that I will spend six minutes addressing issues related to Mr. Towery. Mr. Angeles, counsel for Mr. Rudd, will then address the court using six minutes to address issues related to Mr. Rudd. And Mr. Justice will then use the remaining time to address issues affecting the city of Olympia and the city of Tacoma. So you're hoping to stay within eight minutes, if I got that right? Well, six for me. Oh, six for you. Six for you, six for the next, and then eight? That's 20, I believe. Got it. Okay. You haven't used up any time yet because the clock is not running yet. Thank you. No, we're just doing housekeeping. But as soon as you start, Ms. Morris, we'll start the clock. Okay. Thank you, Your Honors. This morning, Your Honors, Mr. Rudd respectfully requests that you affirm the district court ruling which, upon summary judgment, dismissed the two remaining claims against Mr. Towery. Mr. Towery, I apologize. Mr. Towery, I'm not going to speak for Mr. Angeles. Mr. Towery makes this request. And the two remaining claims outstanding against him, which is a First Amendment speech violation and a Fourth Amendment unreasonable search allegation. Now, what are the Fourth Amendment claims? What are the episodes that form the basis for those claims? So in the Fourth Amendment context, I just want to start by saying there's no dispute that Mr. Towery was operating within the context of the invited informant doctrine. Well, there is a dispute about that. But I asked you about what are the episodes as to which we're speaking when we talk about seizure. Right. The allegations that the plaintiffs have asserted fall along the lines of Mr. Towery collected license plate data that was then passed on to the police for arrest. That's not the case. It's not in the record. They like to say that Mr. Towery, for instance, created this domestic terrorist index. That is not in the record. In fact, I asked you about seizures. Can you talk about seizures? Well, yes. Mr. Towery did not seize anything. He was engaged with the... The argument is that he contributed... The information he provided contributed to seizures. Which are the... What seizures are we talking about? I think it would be the arrests in the city of Olympia, in the city of Tacoma. The plaintiffs were arrested when they were engaged in anti-war protest marches. So the overall concept that we're dealing with here is that Mr. Towery obtained information and he obtained that information, by the way, when he was trying to effectively facilitate his job getting the convoys of equipment to and from the port of Olympia and to and from the port of Tacoma safely. What about the 15 anarchists driving? Did he contribute to that? And is that a seizure? No, Your Honor. In fact, that was not something that was developed in the record of this case. And that's like the allegation that counsel for plaintiffs brought up about Mr. Chin. Mr. Chin is not a plaintiff in this case. I'm not talking about Mr. Chin, but apparently there was a time at which Mr. Towery contributed information. There are three cars leaving. We got 15, quote, anarchists. And two out of the three cars were stopped. Am I correct that there's evidence to the record to that effect? There is not evidence in the record to that effect. There's allegations to that effect, but this is a Bivens action. And so we know under ICTAR- There's no testimony. There's no deposition. There's no nothing on that? No. That's just only in the complaint? That's correct, Your Honor. That's not my understanding of the evidence, although I have to say that there's- the record in this case is very difficult for somebody in my position to manage. Well, Your Honor, what I can tell you is what we learned through discovery. And we did depose 19 different people and we reviewed thousands of pages of paper. And for instance, you brought up a point earlier, Your Honor, where you said, I think there's instances where Mr. Towery was asked to leave. And each plaintiff in this case was asked that question directly. Did you ever ask Mr. Towery to leave? And they said, no, we had no reason to. We did not know that he was working under the Invited Informant Doctrine at that time. Please don't do that. I think the evidence is not that Mr. Towery was asked to leave, but rather that the law enforcement people were asked to leave and he fit within the category and didn't leave. Well, if that is the case, so we know from cases like the Numeric case and the Aguilar case that it's okay for an agent to participate and be involved in meetings under the context of... Are you deliberately misunderstanding me? No, I'm not, Your Honor. So I'm a law enforcement officer or I'm working on behalf of a law enforcement officer. I'm undercover. I'm in the meeting. And someone says, who's maybe running the meeting, would anyone involved in law enforcement please leave? It clearly applies to me. I don't leave. Are you saying I'm an invited informant in that circumstance? I think that, yes, I'm arguing that in the Numeric case and the Aguilar case, that we know, the courts have said, you do not have to identify who you are. That you risk sharing information with third parties if you're in a public space or even in your own home or in a hotel that you did not necessarily know what that information, how that information will be disseminated. So I don't think it's... I'm talking about an invitation, just an ordinary common sense of invitation. If there had been an invitation to come in beforehand, when they say, would you please leave? That strikes me. Anyone can understand if there had been an invitation, it was just revoked. So why is he an invited informant in that circumstance? So I appeal to the case, the Numeric case and the Aguilar case again, which gives a context for the fact that you might engage, in those cases, engage with the associations. They never disclose their identity. So there is the ability for the informants to maintain and to engage with those groups. Well, he did want to voluntarily leave because that would blow his cover. Well... Obviously. That would, in my mind, that would essentially unwind the authority that has been granted law enforcement officers under the invited informant doctrine. I don't think he has to leave, but I think it deprives him of the status of being an invited informant. But does the law of invited informant mean once you're invited, you're always invited? I think that I need to put it in this context. You, there is a reasonable expectation of privacy. And as long as the informant does not exceed the scope of the invitation, then we're still not within the realm of a Fourth Amendment illegal search procedure. So if the informant is engaging in activity that would be perceived as exceeding, excuse me, the scope of the invitation, then we run into trouble. What did he do after he was, he didn't voluntarily leave? What, you know, because I have a hard time rummaging through this record also quite candidly. Tell me what happened after he was allegedly disinvited. Well, what did he do? There is no, the record will show that he did not leave, but the record, I know this might be a dispute of fact here, but Mr. Tauer does not recall ever being asked to leave a meeting. So in his mind, he didn't have that conflict. What happened afterwards? What did he do from that moment forward? Well, he continued to, he continued to participate with the protesters. And he related information to the authorities about what was happening, what was likely to happen. If it was information that related to his job in terms of trying to get equipment and personnel safe. What exactly did he do? What exactly did he say? What information did he report about? Well, for instance, he learned of information that there's potential harm to the military equipment, that there might be some objects thrown at the equipment. We need to be aware of this. He would pass that information on to superiors to say, I understand there's going to be some folks out there. There was a discussion of this type of behavior. There was a discussion of running a wire across a roadway to obstruct the convoy. So he would pass that information on to the individuals who were on the ground having to work to make sure that those convoys were done effectively and safely. And as a result of that information, certain action was taken by the authorities, I take it, right? The record actually does not show that, Your Honor. There's commanding officers in the city of Olympia and the city of Tacoma where these arrests occurred. And they have testified that they received information from the army, but it did not impact the decisions they made on the streets on those days, that they were dealing with situations on the spot and that they received no instruction and relied upon no information that Mr. Towery ever provided them in terms of how to deal with protesters. And that's uncontested? There's no issue of fact there? There is no issue. It's on the record. It's undisputed. They did not provide any evidence, either testimonial evidence or documented evidence to the contrary. Counsel, I think we may have taken you well past your planned six minutes. Here. Thank you. Good morning, Your Honors. May it please the Court, Theo Angelis for Mr. Thomas Rudd. To survive summary judgment in this case, plaintiffs had to come forward with evidence showing that Mr. Rudd's own actions, his personal actions or the actions he supervised violated clearly established First or Fourth Amendment rights, and they failed to do so for multiple reasons. With respect to the First Amendment, plaintiffs in their briefs and also Mr. Hilda's here today during argument identified the issues that chilled that allegedly chilled their speech. They consist of false arrests, for example, use of excessive force. None of those actions were committed by or supervised by Mr. Rudd. There's no evidence that they've come forward at all on that point. With respect to the motivation element, whether Mr. Rudd was motivated by suppressing anyone's speech. Again, there's no evidence from which a rational jury, a reasonable fact finder could conclude that Mr. Rudd had the intention to suppress speech rather than to conduct a good faith law enforcement effort. Excuse me, a good faith investigation to determine whether. Now, law enforcement effort would have been illegal, right? Well, Your Honor, it would have been under the PCA. It would have been illegal, not unconstitutional, but illegal. That's right. Your slip of the tongue. You really don't mean to say he was engaged in law enforcement. That's correct, Your Honor. I did not mean to say that. And I hope I call myself. So he was both both Mr. Towery, Mr. Rudd. Seems just jumps out at me. The Army itself concluded that there was a problem. The Army itself looked and said that there was some violation of its regulations. And in fact, those regulations have been tightened up for very good reason. But what Mr. Rudd was trying to do and the reason that it was a good faith investigation under the mayor and Aguilar standard is that Mr. Rudd was trying to look at and determine what the intentions were of individuals who had in the past and who would expect interest in the future of blocking the movement of heavy military equipment with their own bodies, with their children, by throwing pieces of concrete into the road and putting dumpsters into the road. These are legitimate concerns for someone in Mr. Rudd's position. Oh, I understand the legitimate concerns. My problem, and I'm not sure whether there's a legal handle with which to deal with it, that this strikes me as the behavior engaged in by both Mr. Towery and Mr. Rudd runs up against the Posse Comitatus Act. I don't know that there's a private cause of action coming out of that. We do know from the Eighth Circuit that there is an unreasonableness argument that is made if there is a violation of the act. Could you talk about, and I'm not sure Mr. Brennan ever got around to it, the seizures that are alleged to have happened in which there may have been some involvement with the information provided by Mr. Towery? Certainly, Your Honor. I'm happy to talk about that. With respect to seizures, so what is in plaintiff's brief with respect to Mr. Rudd are that the seizures were the arrests that occurred and they allegedly occurred falsely. And our position is that there's a break in causation there. Mr. Rudd cannot, those seizures cannot be attributed to Mr. Rudd for a variety of reasons. He never instructs anyone to do anything. It's a lot like the Wood v. Moss case. Excuse me. It's a lot like the Moss versus U.S. Secret Service case that this court decided in 2007, Judge Tshishima's opinion, as opposed to Judge Berzon's, the earlier case, in which there, there was an allegation that the Secret Service had instructed local law enforcement to take an action, which was to move some protesters. And there was an allegation that because that action was taken with excessive force, that the Secret Service was liable for the excessive force committed by local law enforcement. And what the court said is, that's not a sufficient allegation. You've got to show that there was some causation there based on the fact that the federal official somehow caused the false arrest. Here, the individual officers had a duty to engage in arrests that were only lawful. And there's no suggestion, nor is there any evidence, that Mr. Rudd encouraged a false arrest, suggested a false arrest. And I want to talk just briefly, go back to your Honor's question about the three vehicles with the anarchist Senate email. The only testimony on point, and I think what your Honor is remembering is that ER 3043 to 44, there are questions from Mr. Hildas to Mr. Rudd where he says, to Mr. Rudd, were you aware that these three vehicles, two of the three vehicles were stopped? And Mr. Rudd says, no. And then Mr. Hildas said, were you aware, for example, that one of the cars holding Mr. Towery was not stopped? And Mr. Rudd says, no. Counsel's questions are not evidence. And they certainly don't carry the day. You know, I confess because this record is so big, I have not had the opportunity to read it probably any more than Judge Layton read the entire record. But I recall reading something looked like a transmission. It was a text message or an email saying there are three cars leaving with 15 anarchists. So that's right. Where's that in the record? That is ER 2019-2019. That is an email that Mr. Rudd testified that he received from Officer Fouts and transmitted to Officer Green. That's his own testimony. So let's look at the email itself because that's the undisputed piece of evidence. So this email is coming from Fouts? What Mr. Rudd testified to is that he took information from Fouts. The email is from Mr. Rudd himself. No, what the email about there are three cars with, who's that one coming from? It's from Mr. Rudd to Officer Green. So he originates the email? Mr. Rudd originates the email with evidence that he testifies that he got from Officer Fouts. But that point, that part is irrelevant. Even if it had come from Mr. Rudd directly drawing every inference in favor of plaintiffs as we must do at this stage. There's no instruction in there to do anything, Your Honor. It simply says there are these 15 individuals who he identifies as anarchists. And that's an important point because right or not, and in fact, wrongly, Mr. Rudd, it's undisputed that Mr. Rudd used the term anarchist to refer to a particular subset of individuals who were the ones who were engaged in these blocking activities in a very dangerous way. And the threat assessments, all of those that Mr. Rudd authored that are in the record, all of them, in fact, distinguished between that group of protesters and those that were engaged in protected activities. So this is a group of people engaged in unprotected activity. And those are the ones that Mr. Rudd was focused on. I think the term anarchist is the term that they themselves used to describe themselves. That's right, Your Honor. And in fact, they always distinguished themselves between protected activity and unprotected activity and indicated that their goal was to engage in this, what Mr. Hildas calls nonviolent civil disobedience. But what Mr. Rudd saw was a threat to the movement of this heavy equipment that, you know, sometimes to the children of these protesters. OK, now I think we've just taken you over your six minutes also. Thank you, Your Honor. Well, let me just sum up very quickly and just say the claims... All right. Well, we'll let Mr. Justice go. Thank you, Your Honor. May it please the court. My name is John Justice. I represent the city of Olympia defendants. I'm also presenting arguments on behalf of the city of Tacoma defendants in this case. The district court summary judgment on behalf of the city of Olympia and city of Tacoma defendants should be affirmed. The plaintiffs below did not establish any basis for municipal civil rights liability against either Olympia or Tacoma, nor did they present any evidence against any of the individually named defendants to overcome qualified immunity. Judge Layton went through each allegation that was raised below. And if the court looks at Judge Layton's opinion, he spells out each specific arrest, seizure, use of force that was alleged. So that gives the court some sort of a roadmap through this lengthy record as to what was alleged and why those allegations did not rise to the level of a constitutional violation, nor did the appellants cite any clearly established case law to overcome qualified immunity. Now, the genesis of this case, obviously, as this court has gleaned, occurred in the fall of 2007. There are some arrests that occurred prior to that period of time that were barred by the statute of limitations. And that's the claims of arrest in the fall, excuse me, the summer and spring of 2007. That would be Jeff Berryhill and Brendan Dunn. With regard to the other allegations, there is no evidence in the record that the city of Olympia acted in any certain way based on intelligence that was gathered by Mr. Towery and passed on to Mr. Rudd. That is undisputed in the record. There is no evidence that the city based any of its tactics in responding to the protest based on any of this information gathering by Mr. Towery. In fact, the city of Olympia was not even aware that Mr. Towery was the person engaging in this information gathering. It was dealing with what they saw happening on the streets, the pepper spray and all that type of stuff. That's correct. The evidence establishes that the tactics used by the city of Olympia were based on the real-time actions of the protesters. And with regard to those actions, the district court went through each of those and found that the actions did not establish, the alleged actions did not establish a constitutional violation, nor did the plaintiffs point to any clearly established case law that would have put these officers on notice that what they did do in those protests was a violation. The pepper spray was OK under the circumstances. It didn't cross the line. Correct. That's exactly right, Your Honor. Now, with regard to the final issue, I guess, is the award of costs. The defendants were the prevailing parties and the statutes and the court rules clearly supported the award of costs in this case. And those award of costs should be affirmed. Do we review that, you know, for abuse of discretion? That's correct. The standard is abuse of discretion, Your Honor, and the court went through and awarded costs for depositions that were taken that were at the time they were taken, clearly believed to be necessary for the case, which supports the award of costs in this case. And how much are we talking about in terms of costs? Thirty-eight thousand, is it? Collectively amongst all of the various defendants. That's correct, Your Honor. Are you going to go after them to collect? Well, I won't be doing that decision. Not my decision, Your Honor. So if the court has any questions about any of the specific instances, I'd be happy to address them. But if not, that's all I have. No questions here. OK. All right. Thank you. Mr. Morris, if you would put two minutes on the clock for Mr. Hildes. Thank you, Your Honor. OK. Thank you. First of all, I want to tie up one note. It is Exhibit 206, is the email from Rudd to Green. And it's cited in the depots. And the circumstances are cited in Berryhill and Dunn's depots. And in fact, of those three vehicles, two of them were pulled over in the next few minutes and the drivers were cited. Right. And did the information come to Rudd from Fouts? Is that correct? That was Rudd's contention in depot. But the email just comes from Rudd. So we don't actually... You don't have any evidence to the contrary? We don't. But his job is not to relay evidence from the Grays Harbor Sheriff's Office to the Aberdeen Police Department in the same city. I don't recall Rudd having a job description. In addition, he then calls the court when one of these cases comes up to make sure it's heard on the docket before anybody can be there to support. He meaning Rudd? Yeah, Rudd on his own. And the problem... Quickly on Olympia and Tacoma, Judge Layton weighed evidence and by his admission, took it in a light most favorable to the moving party, not the non-moving party. He made numerous factual determinations and that is abuse of discretion. And he weighed the evidence. He weighed his opinion as to what had occurred. Nobody ever threw anything at any vehicle. And the vehicles that we're talking about are striker vehicles. They are tanks. They're maneuverable urban warfare tanks. It is not... If someone had thrown a rock at a striker, it would have bounced off. But nobody did. Nobody ever had any intention and nobody ever discussed doing so at a meeting with the possible exception of Towery. And it's interesting. There are people who label themselves as anarchists in the group, but that was not a general label. There were a lot of people who weren't in any case political views are protected, but it was as Rudd used it as shorthand. Towery used it as shorthand. By the logic of anyone committing civil disobedience or blocking something as an anarchist, Martin Luther King was an anarchist. Gandhi was an anarchist. Now you're over time, so if you'd like to sum up. Okay. Disputes over factual evidence, unqualified immunity, we have much of that here, is a determination for the trier of fact. All of the factual allegations that are disputed should have been brought to the trier of fact. And what this did to the First Amendment is very difficult to repair. You do not want the military. The job of civilian law enforcement is to protect the public. Often they do it badly. We sue the police all the time. The job of the military is to find the enemy and neutralize or kill them. You do not want the military determining that the people are the enemy. I don't think anybody tried to kill anybody. No, but they talked about neutralizing their expression, preventing them from achieving the objectives of peaceful demonstrations, threat assessments as to the peaceful demonstrations they might engage in. It's a total loss of perspective. And then you have Adamson saying Martin Luther King was a terrorist and anyone who impairs law enforcement is a terrorist. And it's a seamless package. Towery admits he can't separate when he was acting for the army and when he was acting for civilian law enforcement because whatever he heard would determine where he passed it on. And that is what posse comitatus is designed to prevent. OK, thank you very much. Thank both sides for their arguments. The case of Panagakos versus Towery now submitted. And that finishes our oral argument for this morning. Thank you. We're in adjournment.
judges: W. Fletcher, Gould, Block